## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CALVIN L. FARMER,**

     **Plaintiff,**

**vs.**                        **Case No.  4:16cv614-MW/CAS**

**NANCY A. BERRYHILL, Acting
Commissioner of Social
Security,[1]**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of Social Security denying Plaintiff's applications for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act) and an application for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Act.  After consideration of the entire record, it is recommended that the decision of

---

[1]  On January 23, 2017, Nancy A. Berryhill, became the Acting Commissioner of Social Security.

the Commissioner be reversed and the case remanded for further

proceedings.

## I. Procedural History

On May 15, 2013, Plaintiff, Calvin L. Farmer, filed for DIB and SSI

alleging disability beginning June 30, 2009, complaining of depression,

anxiety, back, shoulder, and knee problems, vision problems, severe

headache, and difficulty breathing due to chest pains.  Tr. 12, 57, 60-61,

83, 204-13, 236.  Plaintiff also complained that he was unable to be

employed because of his learning disability.  Tr. 252.  (Citations to the

transcript/administrative record, ECF No. 10, shall be by the symbol "Tr."

followed by a page number that appears in the lower right corner.)

Plaintiff's date last insured, or the date by which his disability must have

commenced in order to receive DIB, is June 30, 2012.  Tr. 12.

Plaintiff's applications were denied initially on July 2, 2013, and upon

reconsideration on August 7, 2013.  Tr. 12, 79-80, 95, 109-12, 113-26, 132-

34.  On August 16, 2013, Plaintiff requested a hearing.  Tr. 12, 143-44.  On

March 2, 2015, Plaintiff's counsel submitted a pre-hearing memorandum,

which was considered by the ALJ.[2]  Tr. 23, 286-88.  On March 10, 2015, in

---

[2]  Counsel argued, in part, that Plaintiff's "condition appears to meet Listing 12.05B and C by virtue of the valid IQ scores recorded by" Robert Kline, III, Psy.D., who conducted a general clinical interview and mental status evaluation of Plaintiff on behalf of Social Security, Tr. 322-27.  Tr. 287.

Tallahassee, Florida, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Jeffrey Marvel.  Tr. 12, 32-56.  John Black, Ed.D., an impartial vocational expert, testified during the hearing.  Tr. 12, 34, 50-54, 191-93 (Resume).  Plaintiff was represented by Elizabeth Scherer, an attorney.  Tr. 12, 31-32, 200-03.

On April 23, 2015, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from June 3, 2009, through the date of the ALJ's decision.  Tr. 25.  Plaintiff requested review of this decision, Tr. 5-8, which the Appeals Council denied on August 8, 2016.  Tr. 1-4.  The ALJ's decision stands as the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

On October 5, 2016, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  ECF No.1.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant met the insured status requirements of the Social Security Act through June 30, 2012."  Tr. 14.

2. "The claimant has not engaged in substantial gainful activity [SGA] since June 30, 2009, the alleged onset date."  *Id.*  It appears Plaintiff was employed and met the requirements for SGA in 2003 through 2005 as a short-order cook.  Tr. 219-21.  Plaintiff reported that he completed specialized training in "Commercial Food and

Culinary Arts" in 1981.  Tr. 237.  Plaintiff also reported that he worked from "2000 off and on" (and working part-time) until June 30, 2009, as a grill-cook or short order cook ("[k]itchen helper and cook, yeah, a prep cook" and "[m]ostly dinner meals") in a restaurant (Ruby Tuesday).  Tr. 37, 238, 245, 280, 290 (past work summary); *see* Tr. 286 (Plaintiff's "past relevant work includes that of a cook and various construction jobs.").  Plaintiff testified while working at Ruby Tuesday, he had no supervisory responsibilities and was "[j]ust a helper," "[b]asically."  Tr. 38.  Plaintiff testified he has no source of income; he lives in Section 8 housing; receives food stamps; has no health insurance; and has lived in an apartment by himself for about four years and on the streets before that.  Tr. 42.

3.  "The claimant has the following severe impairments: borderline intellectual functioning [BIF], major depressive disorder, recurrent, moderate; generalized anxiety disorder; chronic obstructive pulmonary disease."  Tr. 15.

4.  "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. 16.  The ALJ considered whether Plaintiff met or equaled the requirements of several Listings, and relevant here, Listing 12.05B and C.  Tr. 16-18.

5.  "[T]he claimant has the residual functional capacity [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) such that he can lift/carry 50 pounds occasionally and 25 pounds frequently.  The claimant can sit for six hours in an eight-hour workday and stand/walk for six hours in an eight-hour workday.  He should avoid concentrated exposure to dust, fumes, and other pulmonary irritants.  He is able to do only simple, routine, repetitive work.  He could work no more than a regular pace (no production rate, no assembly line)."  Tr. 19.

6.  "The claimant is unable to perform any past relevant work" as a short order cook with an SVP of 3, semi-skilled, and medium as

performed and light exertional level per the <u>Dictionary of Occupational Titles</u> (DOT).[3]  Tr. 23; *see supra* at ¶ 2.

7.  The claimant was born in 1964, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  The claimant has a limited education.  Prior to the hearing, Plaintiff reported completing the 10th grade and attending special education classes.  He is able to communicate in English.  Tr. 23, 237, 330 (10th grade education).  However, Plaintiff "reported [to Dr. Kline] an 8th grade education.  He was reportedly maintained in special education classes throughout his academics.  He stated he failed 9th grade and was suspended from school 'all the time' for fighting and behavioral issues."  Tr. 323.  Plaintiff testified he completed 8th grade and enrolled in "LSD" classes, not regular classes, for all of his school years.  Tr. 36.  He testified that he "can't write and read" and does not use a computer because he is "illiterate."  Tr. 47.

---

[3]  In part, "[s]emi-skilled work is work which needs some skills but does not require doing the more complex work duties."  20 C.F.R. § 404.1568(b).  Unskilled work means, in part, "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength."  20 C.F.R. § 404.1568(a).  "Specific Vocational Preparation [SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An SVP of one means "[s]ort demonstration only."  *Id.*  An SVP of two means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*  An SVP of three means "[o]ver 1 month up to and including 3 months."  *Id.*  Unskilled work corresponds to an SVP of one and two.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Semi-skilled work corresponds to an SVP of three and four whereas unskilled work corresponds to an SVP of one to two.  *Id.*  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b); *see* DOT (4th ed., rev. 1991), App. C: Components of the Definition Trailer, § IV, Physical Demands-Strength Rating (Strength).  "Medium work involves lifting not more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c); *see* DOT (4th ed., rev. 1991), App. C: Components of the Definition Trailer, § IV, Physical Demands-Strength Rating (Strength).

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform" such as dietary aide, order puller, and dining room attendant, all with an SVP of 2, unskilled, and medium exertional level.  Tr. 24; *see supra* at n.3.

9. "The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2009, through the date of" the ALJ's decision."  Tr. 25.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute

its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  <u>Moore</u>, 405 F.3d at 1211.[4]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage

---

[4] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509,

(duration requirement).[5] Both the "impairment" and the "inability" must be

expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212

(2002). In addition, an individual is entitled to DIB if he is under a disability

prior to the expiration of her insured status. *See* 42 U.S.C.

§ 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d

1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human

Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R.

§ 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful
   activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet
   or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
   Subpart P?

---

[5] The relevant DIB and SSI regulations are virtually identical. As a result,
citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599,
unless a SSI regulation provides otherwise. The parallel regulations are found at 20
C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations,
e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[6]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the

---

[6] An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211.  On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. §§ 404.1512(d), 416.912(d).  The question here is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).

## IV.  Legal Analysis

### A. Issues

Plaintiff argues the ALJ erred when he determined that the Plaintiff's projected IQ scores, ranging from 50 to 63, Tr. 326, determined by

Dr. Kline, were invalid and, as a result, did not meet the criteria of Listing 12.05B and C.  ECF No. 13.  In the alternative, Plaintiff argues that "remand would be required here for the ALJ to explain what standard he used in assessing deficits in adaptive functioning."  ECF No. 13 at 9. Plaintiff also argues that remand is necessary to the extent the ALJ believed Dr. Kline's consultative examination results were defective and caused the record to be incomplete.[7]  ECF No. 13 at 9-10.

The Commissioner responds that substantial evidence supports the ALJ's determination that the ALJ properly reviewed Plaintiff's daily activities and work history and properly concluded that Plaintiff's reported IQ scores were invalid, essentially because Plaintiff necessarily did not have the requisite deficits in adaptive functioning "to meet the diagnostic description of an intellectual disability."  ECF No. 16 at 8-9.

### B.  Whether the ALJ erred in determining that Plaintiff was not disabled.

### 1.  Introduction

Plaintiff's argument centers on whether the ALJ erred in not finding that his mental impairment met or equaled the criteria of Listings 12.05B or 12.05C.

---

[7]  The ALJ did not conclude that Dr. Kline's report was defective, only that the reported IQ scores were invalid.

The claimant has the burden of proving that his or her impairment(s) meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990). "For a claimant to show that [his] impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*

Listing 12.05B and C provides in relevant part:

12.05 Intellectual disability:  Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * * *

B.  A valid verbal, performance, or full scale IQ of 59 or less; OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05B and C.

Listing 12.05B has two elements.  First, it requires one valid IQ score of 59 or less.[8]  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05B.  IQ scores obtained after age 22 raise a presumption that they are reflective of lifelong intellectual functioning.  Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001).  Second, it requires deficits in adaptive functioning which initially manifested before age 22.  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05.

> To meet listing 12.05 ("intellectual disability"), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."  Crayton, 120 F.3d at 1219.  These requirements are referred to as the listing's "diagnostic criteria."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description for [intellectual disability].")  In addition to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing.  See id. § 12.05.  Under paragraph C, the only paragraph at issue here, a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

Frame v. Comm'r of Soc. Sec. Admin., 596 F. App'x 908, 910-11 (11th Cir. 2015) (unpublished).

---

[8]  When multiple IQ scores are derived from an IQ test, the lowest score, in conjunction with Listing 12.05, is considered.  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00D.6.c. ("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full-scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.")

As noted above, generally, the claimant meets the criteria for presumptive disability under Listing 12.05C when the claimant presents a valid IQ score of 60 through 70 inclusive and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.  *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir.1992) (a valid IQ score need not be conclusive of mental retardation, where IQ score is inconsistent with other evidence in record concerning claimant's daily activities and behavior); Crayton v. Callahan, 120 F.3d1217, 1219-20 (11th Cir. 1997).  "An ALJ should consider whether the results of an I.Q. test are consistent with the other medical evidence and the claimant's daily activities and behavior."  Henry v. Barnhart, 156 F. App'x 171, 173 (11th Cir. 2005) (unpublished) (citing Popp v. Heckler, 779 F.2d 1497 (11th Cir. 1986)).

In Hodges v. Barnhart, a case cited by Plaintiff, ECF No. 13 at 2, the court found that there was a presumption of deficits in adaptive functioning *prior* to age 22 if the claimant had a valid IQ score between 60 and 70.  *Id.* at 1268-69 ("absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of fairly constant IQ throughout [the claimant's] life").  The court cautioned, however, that this presumption did not shift the burden of proof from the claimant to prove

entitlement to benefits.  *Id.* at 1269.  Moreover, the court explained that this

presumption is rebuttable and the Commissioner may present evidence of

the claimant's daily activities to rebut the presumption of mental

retardation.[9]  *Id.*  The Commissioner is not required to find "intellectual

disability," formerly "mental retardation" based on IQ scores alone.  In

<u>Hodges</u>, there was no evidence rebutting the presumption that the plaintiff

had mental retardation with deficits in adaptive functioning.  276 F.3d at

1268.  The record was devoid of evidence related to plaintiff's mental

condition before age 22 and the record indicated that the plaintiff could

barely read from books and needed her daughter's assistance to write

letters.  *Id.*  The court remanded for the purpose of examining plaintiff's

activities of daily living to see if those activities rebutted the presumption of

mental impairment.  *Id.* at 1269.

Consistent with <u>Hodges</u>, "[i]f a claimant has been able to adapt in

functioning after age 22, it is permissible to find that Listing 12.05C has not

---

[9]  "Effective September 3, 2013, the Social Security Administration replaced the term *mental retardation* with the term *intellectual disability* as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,4501 [sic] (Aug.1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt P, app 1). This change was made because "the term 'mental retardation' "has negative connotations," and "has become offensive to many people.  *Id.* at 46,499.  But this change "d[id] not affect the actual medical definition of the disorder or available programs or services."  *Id.* at 49,500 [sic].  <u>Frame v. Comm'r of Soc. Sec. Admin.</u>, 596 F. App'x at 910 n.2.

been met." Monroe v. Astrue, 726 F. Supp. 2d 1349, 1355 (N.D. Fla.

2010).  The court in Monroe explains:

> In an unpublished case, the Eleventh Circuit has recast the rule of
> Popp: to meet Listing 12.05(C), "a claimant must at least (1) have
> significantly subaverage general intellectual functioning; (2) have
> [current] deficits in adaptive functioning; and (3) have manifested
> deficits in adaptive behavior before age 22." *Pettus v. Astrue*, 226
> Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (not selected for
> publication in the Federal Reporter, No. 06-15667).  However, it has
> been pointed out that: "Listing 12.05 does not require *significant*
> deficits in adaptive functioning; it only requires that there be 'deficits
> in adaptive functioning initially manifested during the developmental
> period; i.e., . . . before age 22.'  20 C.F.R., Part 404, Subpart P,
> Appendix 1 § 12.05." *Cammon v. Astrue*, 2009 U.S. Dist. LEXIS
> 92293, 2009 WL 3245458, *11 (N.D. Ga. Oct. 5, 2009) (No. CIV. A.
> 3:08-CV-0131-JFK).

Id. at 1355 n.5.  Further,

> The caselaw addressing the "adaptive functioning" aspect of
> Listing 12.05C suggests that the adaptive functioning must be
> significantly inconsistent with the I.Q. score.  An ability to do simple
> daily activities and simple jobs is not enough.  As noted in *Lowery*, in
> *Popp* the court sustained the ALJ's rejection of a claim of equivalency
> to Listing 12.05C because the claimant's I.Q. score of 69 was
> "inconsistent with evidence that [the claimant] had a two-year college
> associate's degree, was enrolled in a third year of college as a history
> major, and had worked in various technical jobs such as an
> administrative clerk, statistical clerk, and an algebra teacher."  979
> F.2d at 837, citing *Popp*, 779 F.2d at 1499.  Additionally, there was
> evidence in *Popp* that the claimant had "tended to place himself in a
> very unfavorable light," thereby rendering the personality test scores
> (the MMPI, not the I.Q. test) invalid in the opinion of the examiner.
> *Popp*, 779 F.2d at 1498-1499, 1500.
>
> *Popp* is perhaps the strongest case for finding that an I.Q.
> score below 70 does not necessarily meet Listing 12.05C.  There are
> several others with facts somewhat like *Popp*.  *Bischoff v. Astrue*,

2008 U.S. Dist. LEXIS 79534, 2008 WL 4541118 (S.D. Fla. Oct. 9, 2008) (No. 07-60969-CIV), affirmed the determination that Listing 12.05C was not met. The court noted that while the claimant's I.Q. scores were lower than 70, the claimant had previously worked as a parts manager and as an automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years. *Id.*, at *20. There was also evidence that the claimant was "faking" his I.Q. score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training. *Id.*

*Id.* at 1355. As noted in <u>Monroe</u>, a different result was reached in

<u>Durham v. Apfel</u>, 34 F. Supp. 2d 1373 (N.D. Ga. 1998), where the court

held:

> Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102). Mr. Durham has worked primarily as a heavy laborer (TR 46). There is no evidence that these jobs are beyond the reach of a mildly retarded individual.
> 34 F.Supp.2d at 1380. Distinguishing *Popp*, the court said:

> Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer. He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46). Mr. Durham did not go to college, he went to the fourth grade. *Id. See also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability to identify and administer his medication; his previous jobs; his obtaining a GED" were not inconsistent with a finding of mental retardation and the I.Q. scores) (citing *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry, and clean his room.").

Monroe, 726 F. Supp. 2d at 1356-57; *see* Willis v. Astrue, No.

5:12cv64/RS/CJK, 2012 U.S. Dist. LEXIS 182201 (N.D. Fla. Nov. 26,

2012).

Although the ALJ is not required to accept the results of an IQ test as

reported by an expert, the ALJ "cannot act as both judge and physician."

*See* Durham v. Apfel, 34 F. Supp. 2d at 1380 (citing Marbury v. Sullivan,

957 F.2d 837, 840-41 (11th Cir. 1992)).  Put differently, substantial

evidence must support the ALJ's discounting of an IQ score that is

favorable to a claimant.

### 2. The ALJ's decision

At step two, the ALJ determined that Plaintiff had several severe

impairments, including BIF.  Tr.  15.  At step three, the ALJ determined that

Plaintiff did not have an impairment or combination of impairments that

meets or medically equals one of the listed impairments in 20 C.F.R., Part

404, Subpart P, Appendix 1, including Listing 12.05 (intellectual disability).

Tr. 16-18.  In making this determination, the ALJ considered the criteria of

Listing 12.05B and C, but did not expressly refer to, by name, Plaintiff's

"deficits in adaptive functioning" as stated in Listing 12.05.  Tr. 12-25.

The ALJ found "the 'paragraph B' criteria," i.e., Listing 12.05B, were

"not met because the claimant does not have a *valid* verbal, performance,

or full scale IQ of 59 or less and further stated:

> As discussed in the medical evidence of record below, the claimant's mental status examination indicated a Full Scale IQ of 51, which is in the extremely low range. (Exhibit 4F/4) However, as noted in the Listing, in considering the validity of the test result, the factfinder should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities. Here, despite the claimant's performance in the 'extremely low' range, the undersigned notes that the claimant maintains his own home, performs his own grooming, prepares simple meals, and occasionally shops, goes to church, and visits family. (Exhibit 5D/3, 4; 6E/2; 4F/2; HT). Further, although the claimant does not currently drive, he showed the capacity for said activity, as demonstrated by his Florida driver's license. (Exhibit 5/1). Finally, the claimant has past relevant work as a short-order cook, which is semi-skilled. Exhibit 4E/2, HT). These factors are *inconsistent* with the claimant's projected IQ of 51 and *undermine* its validity.
>
> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a *valid* verbal, performance, or full scale IQ of 60 through 70 and a physical or mental impairment imposing an additional and significant work-related limitation of function. As previously discussed, *the claimant's low projected IQs are inconsistent with the record and therefore invalid.*

Tr. 18 (emphasis added).[10]

The ALJ determined that Plaintiff had *mild* restriction in daily living

and *mild* difficulties in social functioning; *moderate* difficulties with regard to

---

[10] Although not at issue in this case, the ALJ also considered the requirements in Listing 12.05A and determined that Plaintiff did not meet the listing criteria. Tr. 18.

concentration, persistence, or pace; and that Plaintiff experienced *no*

episodes of decompensation, which have been of extended duration.

Tr. 17.  The ALJ further noted at this point in his discussion that "[a]s

indicated in the discussion of Listing 12.05, the claimant's IQ scores are

invalid; however, these findings, taken as a whole, support finding a

*moderate* limitation" with regard to concentration, persistence, or pace.  *Id.*

(emphasis added).  (Plaintiff does not challenge these findings except the

ALJ's determination that the IQ scores are not valid.)

The ALJ determined Plaintiff's RFC and included a discussion of

Plaintiff's mental impairments (and physical impairments) prior to assessing

whether Plaintiff was capable of performing prior relevant work.  Tr. 19-23.

As noted by the ALJ, on June 10, 2013, Plaintiff

saw consultative examiner Robert Kline III, Psy.D..  During the
examination, the claimant appeared tearful but was able to attend to
the interview without distraction and no significant decline in
attention; further, he had no difficulty with basic concentration tasks.
However, he exhibited some difficulties with memory and was only
able to recall one of three simple words after periods of one, five,
and fifteen minutes.  Based on the claimant's performance on 10
subtests of the Wechsler Adult Intelligence Scale (WAIS-IV),
Dr. Kline reported that the claimant had a projected intelligence
quotient ranging from 50-63 in various categories including Verbal
Comprehension, Perceptual Reasoning, Working Memory,
Processing Speed, General Ability Index, and Full Scale.
Nonetheless, Dr. Kline assessed the claimant a Global Assessment
of Function [GAF] score of 65, consistent with mild symptoms in
social and occupational function.  (Exhibit 4F/1-5).  The claimant's

performance on the mental status examination supports a limitation to simple, routine, repetitive work, at no more than a regular pace.

Tr. 20.[11]

Dr. Kline referred to Plaintiff's reported activities of daily living:

Mr. Farmer currently resides alone in an apartment in Tallahassee, Florida. He stated he is able to complete basic household chores and maintenance. He presented with appropriate grooming and hygiene and denied difficulty in this area.

Mr. Farmer endorsed sleep disturbance noting he has problems staying asleep. He endorsed appetite disturbance noting, 'it's been wishy-washy lately.'

Tr. 323. As for social functioning, Dr. Kline noted that Plaintiff "reported he does not spend time with friends and that he prefers to be alone. He endorsed withdrawing from social relationships. He denied having any hobbies and stated he generally spends his day sitting around watching movies." *Id.* Plaintiff briefly described his employment history "of working

---

[11]  Plaintiff was administered several tests as part of his "immediate assessment" using the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) with the following results: the Verbal Comprehension Index and projected IQ was *58, in the 0.3 percentile;* the Perceptual Reasoning Index and projected IQ was *63, in the 1 percentile*; the Working Memory Index and projected IQ was *58, in the 0.3 percentile*; the Processing Speed and projected IQ was *50*, in the less than 0.1 percentile; the General Ability Index and projected IQ was *57, in the 0.2 percentile*; and the Full Scale and Projected Index was *51, in the 0.1 percentile.* Tr. 326. Each "evaluation" was "extremely low." *Id.* The ALJ gave "significant weight" to the GAF score of 65 stated by Dr. Kline "as it is consistent with the claimant's consistent activities of daily living and social function that include maintaining his home, occasional grocery shopping, visiting church, and socializing with family and friends. (Exhibit 5E/ 5; HT). Further, this score is consistent with a general lack of mental health treatment, save standard prescription refills. (Exhibit 7F/1, 4, 7, 9, 10, 13)." Tr. 22.

construction and cooking" and "last worked as a cook in 2009 but he was

laid off." *Id.* Plaintiff reported struggling with depression for approximately

five years and was recently formally diagnosed "a few months ago."

Tr. 322.

In addition to the ALJ's summary of Dr. Kline's report, Tr. 20,

Dr. Kline noted under "results of cognitive assessment," that Plaintiff "was

polite and attentive throughout the test administration.  He remained active

and engaged and he interacted appropriately with the testing associate.

Mr. Farmer did struggle with many of the test instructions and directions,

but his effort remained high."  Tr. 324.  At this point in his report, Dr. Kline

noted: "Overall, it is believed that immediate results are valid and accurate."

*Id.*

As part of his prognosis, Dr. Kline noted that Plaintiff "was reportedly

diagnosed with depression approximately 'a couple of months' ago and he

has been prescribed medication since that time."  He also noted that

Plaintiff "is currently being treated with Klonopin and Zoloft.  He is being

provided an Axis I diagnosis of Major Depressive Disorder, Moderate,

Recurrent, to account for his presentation during the meeting evaluation

and his self reported symptoms."  Dr. Kline further stated: "Considering the

results of the achievement testing completed as part of the immediate

evaluation, as well as Mr. Farmer's *adaptive functioning skills*, and his lack of formal education, he is being provided an Axis II diagnosis of [BIF]." Tr. 327 (emphasis added).

As noted above, the ALJ considered Plaintiff's activities of daily living and determined that he had mild restriction. Tr. 70. As part of his RFC determination, the ALJ also considered Plaintiff's activities of daily living and determined that such were "inconsistent with the degree of impairment alleged and undermine the credibility of the statements." Tr. 20. The ALJ further stated:

> The claimant testified that he lives alone in an apartment and has done so for the last four years, which suggests a level of self-sufficiency inconsistent with the claimant's allegations of disability. (HT). Although the claimant reported taking intermittent 10-minute breaks secondary to fatigue, he performs household chores, does his laundry, and goes grocery shopping, though he occasionally depends on his mom and sister to shop for him. (HT). He noted performing personal care, including bathing and dressing. (HT). Further, despite his statements that he does not like to be around people, the claimant reported going to church once per month and visiting friends/family twice per month for dinners and events. (HT). These activities of daily living suggest that the claimant is able to persist at a consistent work effort in spite of his impairments and undermine his allegations to the contrary.

Tr. 20-21. The ALJ discussed "a number of contradictory statements" made by Plaintiff, further determined that Plaintiff's "allegations are generally not credible," and stated:

Although the claimant indicated that he was unable to work as a result of his impairments, he noted that his last job ended because his employer went out of business, which suggests that the claimant would have continued working had circumstances been different. (Exhibit 3E/ 2).    Although the claimant indicated that his ability to walk was limited by his pain, in a pain questionnaire he reported walking to relieve his pain.  (Exhibit 6E/ 2).    Although the claimant reported difficulty performing simple hygiene, (Exhibit 10E/ 4), he reported no issues with personal grooming at the hearing.  (HT). Although the claimant consistently reported being unable to do yardwork, he presented at the ER with back pain after reportedly pulling shrubs in his yard in April 2012.  (Exhibit 3F/ 3).    At the hearing, the claimant reported that he could not carry a gallon of milk; however, during his consultative examination, he reported shortness of breath if he had to carry anything over 40-50 pounds more than 10-15 feet; further, he testified that he occasionally performs his own grocery shopping, which suggests that he is able to lift more than alleged.  (Exhibit 5F/ 1; HT).  These statements suggest that the claimant's symptoms were overstated for the purpose of disability benefits and undermine his allegations. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

The claimant's activities of daily living, lack of treatment/objective abnormalities, and contradictory statements imply that non-impairment related factors led to his current unemployment and render the allegations of disabling symptoms less than credible.

Tr. 21.[12]

---

[12]  The ALJ considered Plaintiff's physical impairments and the assessments of Plaintiff's treating physician, Esaias Lee, M.D.; a State agency medical consultant (on reconsideration), Edmund Molis, M.D.; and another State agency medical consultant, Wayne Sampson, M.D., whose opinions do not support Plaintiff's claim of disability due to physical impairments.  Tr. 19-22; *see* Tr. 83-95, 329-38, 407-10.

With respect to Plaintiff's mental status, the ALJ noted that State agency psychological consultant, Corine Samwel, Ph.D., at the initial level and on June 17, 2013, determined, after reviewing a paper record, that Plaintiff's "mental impairments were severe."  Tr. 22.  "Nonetheless, she determined that he could understand, retain, and carryout simple instruction [sic]; consistently and usefully perform routine tasks on a sustained basis, with normal supervision; cooperate effectively with public and co-workers in completing simple tasks and transactions; and adjust to the mental demands of most new tasks.  (Exhibit 1A/6, 10-11)."  Tr. 22-23.  (Dr. Samwel referred to a portion of Dr. Kline's report.  Tr. 63.)  The ALJ also referred to a record evaluation by State agency psychiatric consultant, Sally Rowley, Psy.D, on reconsideration, dated August 1, 2013, that "affirmed [Dr. Samwel's] opinion.  (Exhibit 7A/11; 8A/11)."  Tr. 23; *see* Tr. 93, 106.  The ALJ gave these opinions

> great weight, as they are consistent with the medical evidence showing that the claimant demonstrated understanding on examination.  (Exhibit 5F/7) [Tr. 335].  These findings are also consistent with the claimant's activities include maintaining his own home, grooming, preparing simple meals, occasionally shopping, going to church, and visiting family.  (Exhibit 5D/3, 4; 6E/2; 4F/2; HT).  Further, as state agency consultants, Drs. Samwel and Rowley are family [sic] with Social Security Administration program requirements.  Thus, their findings merit great weight.

Tr. 23.

This case falls between <u>Popp</u> and <u>Monroe</u>/<u>Durham</u> and is closer to the latter cases.  Plaintiff told Dr. Kline that he has an eighth grade education, was maintained in special education classes throughout his academics, and failed ninth grade.  Tr. 323.  He told Dr. Kline that he resides alone in an apartment and he is able to complete basic household chores and maintenance.  *Id*.  He reported not spending time with friends, he preferred to be alone, and endorsed withdrawing from social relationships.  He denied having any hobbies and stated he generally spends his day sitting around watching movies.  *Id*.  He reported an employment history of working construction and cooking and last worked as a cook in 2009, but was laid off.  *Id*.  He maintained good eye contact throughout the evaluation session; his motor activity was appropriate; and there were no apparent difficulties noted with posture or gait.  Tr. 323-24.  He was polite and cooperative and it was believed that he tried to engage in the interview to the best of his ability.  Tr. 324.  His speech was spontaneous, normal in rate and tone, poorly articulated, and at times difficult to understand.  *Id*.  His thought expression during the immediate evaluation was generally rational and logical, and there were no loosening of associations, rambling speech, or delusional thinking evident.  His expressed verbal structure was relevant and logical, albeit simple and

concrete.  He was able to attend the interview without distraction and no

significant decline in attention was noted; he had no difficulty with basic

concentration tasks and the formal mental status evaluation showed that he

was fully oriented.  *Id.*  The results of the Cognitive Assessment included a

note that he was polite and attentive throughout the test administration; he

remained active and engaged and interacted appropriately with testing

associate; he did struggle with many of the test instructions and directions,

but his effort remained high.  *Id.*  There is no indication that Plaintiff was

malingering when he took the IQ test.  Prior to stating the test results,

Dr. Kline noted: "Overall, it is believed that immediate test results are valid

and accurate."  *Id.*; *see supra* at n.11 for the test results.

Although Dr. Kline did not note all of Plaintiff's daily and social

activities summarized by the ALJ, including the extent of his employment

activities, Dr. Kline was familiar with the basic structure of these activities

and Plaintiff's limited education.  As noted above, Dr. Kline ultimately

concluded: "Considering the results of the achievement testing completed

as part of the evaluation, as well as Mr. Farmer's adaptive functioning

skills,[13] and his lack of formal education, he is being provided an Axis II

diagnosis of [BIF]."[14]  Tr. 327.

The ALJ determined that the IQ scores were not valid for the reasons

previously stated, but did not expressly state that the scores were invalid

based on Plaintiff's lack of showing deficits in adaptive functioning.  As

noted herein, "[t]he caselaw addressing the 'adaptive functioning' aspect of

Listing 12.05C suggests that the adaptive functioning must be significantly

inconsistent with the I.Q. score.  An ability to do simple daily activities and

simple jobs is not enough."  Monroe, 726 F. Supp. 2d at 1355.  Dr. Kline

considered some of Plaintiff's daily activities and other relevant factors,

including Plaintiff's limited education and work experience, and concluded

the IQ scores, which were "extremely low," as reported by the ALJ, were

valid.  The ALJ does not provide a reasonable explanation for rejecting

---

[13]  As noted by Plaintiff, the ALJ did not expressly discuss the issue of whether Plaintiff had deficits in adaptive functioning, ECF No. 13 at 7, although the ALJ discussed Plaintiff's daily activities, prior employment, and limited education.

[14]  Although Listing 12.05 refers to and defines "intellectual disability," it does not appear that a diagnosis of "intellectual disability" is required in order to meet this listing. Rather, the key to Listing 12.05 is that the claimant satisfy the elements set forth in the regulation and not obtaining a diagnosis.  *See supra* at n.9.  The ALJ determined that one of Plaintiff's severe impairments included BIF, at least implicitly derived from Dr. Kline's assessment.  Tr. 15, 327.  The ALJ does not, however, refer to the diagnosis of BIF as evidence that the low IQ scores are invalid.  *See* Monroe, 726 F. Supp. 2d at 1358.

Dr. Kline's analysis nor does he adequately explain why the evidence is sufficient to rebut the presumption attached to Plaintiff's extremely low IQ scores.[15]  At the very least, the ALJ should have re-contacted Dr. Kline or referred Plaintiff for another consultative examination.  With these unanswered questions, a remand is in order because the record is incomplete.  *See* Graham v. Apfel, 129 F.3d at 1422.  No determination is made regarding whether Plaintiff is disabled and entitled to benefits.

## V.  Conclusion

Considering the record as a whole, the ALJ's findings that Plaintiff is not disabled are not based upon substantial evidence in the record and the ALJ incorrectly applied the law in light of the inadequate record.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **REVERSED** and this case **REMANDED** for the ALJ to reconsider whether Plaintiff meets or medically equals the criteria of Listing 12.05B and C; reconsider the opinion of Dr. Kline and/or refer Plaintiff for a second consultative examination; and conduct further proceedings deemed appropriate.  Nancy A. Berryhill,

---

[15]  The court has recognized that a valid IQ is presumed to remain fairly constant throughout life and the claimant is entitled to a presumption of deficits in adaptive functioning and otherwise satisfies the diagnostic criteria of Listing 12.05.  Hodges 276 F.3d at 1268-69; *see* Frame, 596 F. App'x at 913 n.6.

became the Acting Commissioner of Social Security, and shall be substituted for Carolyn W. Colvin.

**IN CHAMBERS** at Tallahassee, Florida, on March 9, 2017.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**